# NUNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CARRIE M. GRAY,**

      **Plaintiff,**

**vs.**

                               **Civil Action 2:10-cv-00721**
                               **Judge Michael H. Watson**
                               **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff, Carry M. Gray, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income.  The application, which Plaintiff filed on January 28, 2003, alleged disability since January 1, 1992 due to bipolar disorder, severe panic and depression, and the side effects of her medication.  (R. at 103–05, 117.)

After initial administrative denials of her claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on February 7, 2006.  (R. at 379–423.)  A vocational expert also testified at the hearing.  (*Id.*)  On September 25, 2006, the ALJ issued an unfavorable decision denying benefits.  (R. at 52–71.)  Plaintiff requested review of this decision in November 2006.  (R. at 92.)  The Appeals Council granted Plaintiff's request for review and issued an order remanding the case to the ALJ.  (R. at 98–102.)  On June 19, 2008, the ALJ held a second hearing at which Plaintiff and a second vocational expert appeared and testified.  (R. at

349–78.)  In a decision dated October 31, 2008, the ALJ issued an unfavorable decision.  (R. at 12–29.)  This decision became the final decision of the Commissioner when the Appeals Council denied review on June 17, 2010.  (R. at 4–6.)

Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors, Plaintiff contends that the ALJ erred in weighing the opinion evidence; improperly assessed whether Plaintiff was disabled pursuant to Listing 12.04(C); improperly assessed the "Paragraph B" criteria of Listings 12.04, 12.05(D), and 12.06; and erred in assessing Plaintiff's credibility. Following the Commissioner's response in opposition and Plaintiff's reply, the matter is now ripe for decision.  For the reasons that follow, it is **RECOMMENDED** that the Court **REMAND** this decision to the Commissioner for further consideration.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff offered testimony at both the February 2006 and June 2008 hearings.  She was thirty-eight years old at the time of the second administrative hearing.  (*See* R. at 103.)  Plaintiff attended school through the tenth grade and participated in special education classes.  (R. at 123.)  She has not worked since 1992.  (R. at 117.)

A.  February 7, 2006 Hearing

At the February 2006 hearing, Plaintiff testified that although she completed the tenth grade, she could not perform many basic mathematical tasks such as counting change or balancing a checkbook.  (R. at 387.)  She reported that she quit school because she kept failing her classes.  (R. at 391.)  She stated that she had no disciplinary problems or trouble getting along with others while attending school.  (R. at 400.)

Plaintiff testified to suffering panic attacks that caused trouble with her breathing.  (R. at

394.)  She reported that during these attacks her arms draw up; her fists close; her face and hands go numb; and she cannot move her arms.  (*Id.*)  According to Plaintiff, at the time of the 2006 hearing, she had been on some form of medication for approximately fourteen years due to her panic attacks.  (*Id.*)  Plaintiff's reported that her medication makes her tired.  (R. at 395.)  Although Plaintiff stated having these attacks every other day during earlier periods, at the time of the hearing Plaintiff said that these attacks occurred approximately twice per week.  (R. at 397.)  Plaintiff noted that occasionally these panic attacks would cause her to pass out.  (R. at 394–95.)  She testified that her panic attacks forced her to leave work early, which eventually led to the loss of her last job.  (R. at 396.)  Plaintiff reported that stress and aggravation, such as fights among family members, brings on these panic attacks.  (R. at 402.)

Plaintiff lives with her husband and three children.  (R. at 388.)  She also lives with her son's girlfriend and her baby.  (*Id.*)  According to Plaintiff, the son's girlfriend cares for the baby.  (R. at 388.)  Plaintiff's three children attend school.  (R. at 389.)  Her son's girlfriend completes her school courses via computer.  (R. at 389–90.)

Plaintiff testified that on a typical day she gets up around 4:30 a.m. with her husband, drinks coffee, gets the kids ready for school, and then tries to do housework.  (R. at 397.)  This housework generally consists of picking up the rooms of her trailer.  (R. at 398.)  Plaintiff will usually stay in her pajamas the entire day.  (R. at 399.)  During the average day, Plaintiff reported going back to sleep around 9:00 a.m. and sleeping until approximately 1:00-2:00 p.m.  (R. at 399, 401.)  Other family members do the cooking, dishes, and shopping.  (R. at 398.)  Plaintiff does drive, but only once a month to go to the store or her children's school.  (R. at 389.)  The only other time she leaves the home is to visit her mother.  (R. at 399.)  When

Plaintiff does go out in public she gets angry because she believes people are staring at her.  (R. at 398.)  Plaintiff goes to sleep around 9:30 at night.  (R. at 402.)

B.    June 19, 2008 Hearing

At the June 2008 hearing, Plaintiff reported that she had continued to receive treatment from her psychiatrist, Dr. Hammel, since the time of her last hearing.  She also had been seeing a counselor, Ms. Kish, but her counseling had apparently stopped when Ms. Kish was diagnosed with cancer.  (R. at 360.)  Plaintiff was still living with her husband, son, her son's girlfriend, and the girlfriend's baby.  (R. at 362.)  She once again stressed that she did not take care of the baby during the day.  (R. at 368.)  Plaintiff reported being nervous because her son was going to Iraq.  (R. at 358.)

Plaintiff's primary complaint at this time was that she had been hearing voices.  She reported hearing voices constantly, which told her to do bad things.  (*Id.*)  During the hearing, a voice was telling Plaintiff that the vocational expert was staring at her.  (R. at 369.)  Plaintiff reported that at one point a voice told her to pour hot syrup on the baby.  (R. at 370.)  Other than this, Plaintiff could not explicitly recall any bad things the voices had told her to do.  (*Id.*)  She also stated that a voice had told her that her daughter's school bus was going to crash.  (*Id.*)  Plaintiff reported taking Haldol, which helped somewhat with this issue, but at the same time mixed poorly with her other medication.  (R. at 358.)

In describing her daily activity, Plaintiff reported that she gets up with her husband around 4:00 a.m. and drinks two cups of coffee.  (R. at 361.)  After he leaves, Plaintiff lies back down and sleeps until around 2:00 p.m.  (*Id.*)  Plaintiff testified that she does not go anywhere alone and only goes to the store with her husband approximately once a month.  (R. at 363.)  She

4

noted that other people make her uncomfortable and she is afraid if she is out in public around others she will do something that will get her in trouble.  (R. at 364, 368–69.)

## III. MEDICAL RECORDS

A.  Dr. Hammil

1.  Treatment Notes

The record contains the treatment notes of psychiatrist J. Mark Hamill, M.D., of Scioto Paint Valley Mental Health Clinic, dating back to March 2001.[1]  (R. at 184.)  At this time, Dr. Hamill diagnosed Plaintiff with panic disorder, with agoraphobia under control, as well as major depression in remission.  (*Id.*)  In May 2001, Plaintiff was visibly anxious and reported panic attacks.  (R. at 183.)  Dr. Hamill added adjustment disorder to her diagnoses.  (*Id.*)  Plaintiff saw Dr. Hamill several more times in 2001.  (R. at 179–82.)  Dr. Hamill prescribed various medications which included Doxepin, Effexor, Seroquel, and Valium.  (*Id.*)  On October 10, 2001, Plaintiff reported that she had recently passed out.  (R. at 180.)  Dr. Hamill attributed this occurrence to orthostatic hypotension.  (*Id.*)

Dr. Hamill saw Plaintiff regularly, generally ever four to six weeks, over the course of 2002, with sessions ranging from approximately fifteen minutes to half an hour.  (R. at 170–78.)  Dr. Hamill continued to prescribe medications including Effexor, Topamax, Seroquel, and Doxepin.  (*Id.*)  In January 2002, Dr. Hammil diagnosed Plaintiff with bipolar disorder.  (R. at 178.)  Plaintiff reported feeling generally well, despite some mood swings, in March 2002.  (R. at 176.)  Dr. Hamill noted Plaintiff's increased anxiety level in August 2002.  (R. at 173.)  In

---

[1]  Dr. Hamill's notes reflect that Plaintiff had already been placed on Doxepin at this time.  (R. at 184.)

September and November of 2002, Plaintiff reported depression and anxiety caused in part by memories of her husband's past infidelity.  (R. at 171–72.)  On December 18, 2002, Plaintiff reported an auditory hallucination of a man's voice or radio.  (R. at 170.)  She reported that this had been occurring for approximately six months, but that she was afraid to tell anyone.  (*Id.*)  Dr. Hamill prescribed Abilify.  (*Id.*)

In January 2003, Plaintiff reported having many panic attacks and appeared visibly anxious.  (R. at 169.)  Dr. Hamill diagnosed Plaintiff with generalized anxiety disorder in addition to his past diagnoses.  (*Id.*)  Plaintiff reported both auditory and visual hallucinations in April 2003, leading Dr. Hamill to discontinue Abilify.  (R. at 167.)  In May 2003, Plaintiff reported an increase in panic attacks.  (R. at 166.)  Plaintiff reported that things were going fairly well on July 2, 2003.  (R. at 165.)  Plaintiff reported panic attacks and anxiety in late 2003 around the period when her father passed away.  (R. at 237–38.)

Plaintiff saw Dr. Hamill five times in 2004.  (R. at 231–36.)  Plaintiff continued to report panic attacks and anxiety.  (*Id.*)  In May 2004, Dr. Hamill noted that Plaintiff's described symptoms appeared to demonstrate a mixed bipolar state.  (R. at 233.)  Plaintiff continued to see Dr. Hamill throughout 2005.  (R. at 242, 257–59, 302.)  Plaintiff described having a number of problems at her home.  (R. at 257–59.)  Plaintiff reported auditory hallucinations in November 2005.  (R. at 302.)

The records reflect that Dr. Hamill continued to see Plaintiff intermittently until at least 2008.  (*See* R. at 274–79, 282, 287, 292, 299, 309–11, 335.)  In February 2006, Dr. Hamill diagnosed Plaintiff with schizoaffective disorder, bipolar type, in addition to generalized anxiety disorder and panic disorder.  (R. at 299.)  In 2006, Plaintiff reported that she was experiencing

6

some auditory hallucinations, but also indicated she was relatively stable. (R. at 282, 287, 292, 299.) Plaintiff continued hearing voices in 2007 and also experienced at least a few stressful incidents involving family members. (*See* R. at 274–76, 279.) On January 23, 2008, Plaintiff reported hearing more voices including command voices. (R. at 310.) She specifically stated that a voice told her to dump boiling candy on one of her grandchildren. (*Id.*) Dr. Hamill felt that the chance of Plaintiff actually hurting someone was minimal, but he started Plaintiff on Haldol. (*Id.*) In April 2008, Plaintiff reported that she continued to hear command voices and also that she was concerned about the Army deploying her son to Iraq. (R. at 309.)

     2.    Evaluations

In October 2003, Dr. Hamill completed a "Mental Impairment Questionaire" regarding Plaintiff. (R. at 198–203.) He reported that he had been treating Plaintiff since July 1997. (R. at 198.) Dr. Hamill diagnosed Plaintiff as bipolar, with panic disorder and generalized anxiety. (*Id.*) He concluded that Plaintiff's highest Global Assessment of Functioning ("GAF") in the past year was 35.[2] (*Id.*) Dr. Hamill noted that while Plaintiff had some improvement with treatment, she still had a significant amount of anxiety, panic, and depression. (*Id.*) Side effects to Plaintiff's medication included sedation and decreased concentration. (*Id.*) Dr. Hamill described Plaintiff's prognosis as poor. (*Id.*) He noted severe panic attacks occurring at least

---

    [2]   The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009). Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. "A score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." *Roark v. Comm'r of Soc. Sec.*, No. 3:10-cv-87, 2011 WL 795896, at *4 n.4 (S.D. Ohio Mar. 1, 2011).

once a week, sleep disturbance, and persistent anxiety among Plaintiff's symptoms.  (R. at 199.)

Dr. Hamill assessed Plaintiff's mental abilities in a variety of categories.  (R. at 200–01.)

Among his conclusions, Dr. Hamill found that Plaintiff had "no useful ability to function" to

maintain regular attendance and be punctual within customary/usually strict tolerances; complete

a normal workday and workweek without interruption from psychologically based symptoms;

perform a consistent pace without an unreasonable number and length of rest periods; and deal

with normal work stress.  (R. at 200.)

Within his October 2003 evaluation, Dr. Hamill further opined that Plaintiff was either

markedly or extremely limited in activities of daily living; maintaining social functioning; and

maintaining concentration, persistence, or pace.  (R. at 201.)  Dr. Hamill also concluded that

Plaintiff had a medically documented history of a chronic organic mental, schizophrenic, or

affective disorder accompanied by a residual disease process that resulted in such marginal

adjustment that even a minimal increase in mental demands or change in the environment would

be predicted to cause Plaintiff to decompensate.  (R. at 202.)  Additionally, Dr. Hamill concluded

that Plaintiff had an anxiety related disorder and complete inability to function independently

outside her home area.  (*Id.*)  Finally, Dr. Hamill determined that Plaintiff's impairments lasted,

or were expected to last, at least twelve months.  (R. at 203.)

In March of 2005, Dr. Hamill wrote a narrative to Plaintiff's attorney.  (R. at 239.)  At

the time, Dr. Hamill approximated that Plaintiff's GAF was at 40.  (*Id.*)  He stated that the

remainder of Plaintiff's clinical picture was not significantly different from the assessments of

his October 2003 evaluation.  (*Id.*)

In June 2008, Dr. Hamill completed a work stress questionnaire.  (R. at 311.)  Dr. Hamill

8

indicated that Plaintiff has severe anxiety and that, in his opinion, she would not be able to handle the stress of any job, even unskilled.  (*Id.*)  Dr. Hamill completed a second work stress questionnaire in July 2008 reaching similar conclusions.  (R. at 335.)  Dr. Hamill also noted that Plaintiff's borderline intelligence makes it hard for her to adapt.  (*Id.*)

B.    Ms. Kish

1.    Treatment Notes

The record reflects that Plaintiff began counseling with Robin Kish, LISW, at least as of December 2003.  (R. at 221–24.)  At that time, Plaintiff and Ms. Kish discussed the death of Plaintiff's father.  (R. at 221.)  Plaintiff reported that her symptoms had been more intense and that she was experiencing panic attacks every day.  (*Id.*)  Plaintiff described being able to comfort her children at this time.  (*Id.*)

Plaintiff saw Ms. Kish at least ten times in 2004.  (R. at 204–18, 246–49.)  Plaintiff's affect was improved in January 2004.  (R. at 218.)  She described difficulty going out in public because she felt everyone was looking at her.  (*Id.*)  Ms. Kish noted that Plaintiff had been going to a friend's house with her husband.  (*Id.*)  It also appears at this time Plaintiff was attending her children's school and sports functions.  (*Id.*)  In March 2004, Plaintiff reported increased panic attacks and that she had gone to the hospital.  (R. at 212.)  Plaintiff reported more energy and more activities during the daytime.  (*Id.*)  During her June 2004 session Plaintiff was smiling and laughing, but also reported increased depression and continuing panic attacks.  (R. at 210.)  Plaintiff was "very positive" in her July 2004 appointment with Ms. Kish.  (R. at 208.)  By August 2004, however, Ms. Kish noted that there was increased stress at Plaintiff's home.  (R. at 206.)  Plaintiff was depressed and cried throughout her November 2004 session.  (R. at 248.)

Ms. Kish continued to see Plaintiff in 2005. (R. at 240–41, 243–45, 260–63, 268–71.)  In February 2005, Plaintiff was exercising and losing weight, and noted increased energy.  (R. at 240.)  Plaintiff was doing well in April 2005 and had been involved in many activities with her children. By May 2005, however, she reported depression and anxiety.  (R. at 268–70.)  In September 2005 Plaintiff was excited about becoming a grandmother.  (R. at 260.)  She told Ms. Kish that she was happy to be preparing for a baby and that she planned to raise her son's child because she wanted another baby.  (*Id.*)

Plaintiff continued regular visits with Ms. Kish during 2006.  (*See* R. at 280–81, 283–86, 288–91, 293–97, 300–01.)  In January 2006, Plaintiff brought her son's girlfriend's baby to her appointment.  (R. at 300.)  She admitted that she feels less tired during the day when she is busy. (*Id.*)  In March 2006, Plaintiff was not sleeping even with her medication.  (R. at 297.)  On July 7, 2006, Plaintiff reported to Ms. Kish that everything was going well and that she was going fishing with her husband.  (R. at 288.)  In May 2007, Ms. Kish reported that Plaintiff seemed to be doing well, but Plaintiff did report increased depression.  (R. at 277.)

2.    Evaluations

On November 15, 2004, Ms. Kish completed a mental impairment questionnaire.  (R. at 225–30.)  Ms. Kish noted that Plaintiff responded positively to individual therapy, but still experienced significant anxiety, depression, and panic.  (R. at 225.)  Ms. Kish emphasized that Plaintiff suffered from extreme panic attacks; was unable to function in public settings; and exhibited depressed mood and crying spells.  (*Id.*)  She assigned Plaintiff a GAF of 45 and listed

her prognosis as poor with medication as a lifelong necessity.[3] (*Id.*)  Ms. Kish's conclusions

regarding Plaintiff's mental work abilities included that Plaintiff had "no useful ability to

function" in maintaining regular attendance and being punctual; working in coordination and

proximity to others; completing a normal workday or workweek without interruptions from

psychological symptoms; and dealing with normal work stress.  (R. at 227.)  She stated that

Plaintiff's anxiety and panic, in combination with her memory and concentration deficits, would

make it difficult for Plaintiff to maintain any job.  (R. at 227.)  Ms. Kish opined that Plaintiff had

marked functional limitations in activities of daily living; maintaining social functioning; and

maintaining concentration, persistence, or pace.  (R. at 228.)  Finally, Ms. Kish also suggested

that Plaintiff met the Listing requirements of Sections 12.04(C) and 12.06(C).  (*See* R. at 227.)

229–30.)

C.     Dr. Kadle

        Joanne Kadle, Ph.D., evaluated Plaintiff on May 1, 2003 based on a review of the records

at that time.  (R. at 186–97.)  Dr. Kadle evaluated the areas of understanding and memory;

sustained concentration and persistence; social interaction; and adaptation.  (R. at 187–88.)

According to Dr. Kadle, Plaintiff was markedly limited in her ability to carry out, understand,

and remember detailed instructions, and her ability to interact approriately with the general

public.  (R. at 188.)  Based on her review, Dr. Kadle found that Plaintiff retained the mental

residual functional capacity ("RFC") for one to two step tasks of a routine and repetitive nature

_____

        [3]  "[A] GAF score between 41 and 50 reflects 'serious symptoms such as suicidal
thoughts, severe obsessive rituals, or other serious impairments in social, occupational or school
functioning.'" *Hash*, 309 F. App'x at 988 n.1 (quoting American Psychiatric Association,
Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed.1994)).

in a stable environment without strict time or production quotas.  (R. at 189.)

Dr. Kadle also evaluated the Listing requirements of Sections 12.03, 12.04, 12.05, and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 191–97.)  Dr. Kadle concluded that Plaintiff did not satisfy any of these Listing requirements.  (*Id.*)  In evaluating the "B" Criteria of the Listings, Dr. Kadle opined that Plaintiff had moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation.  (R. at 196.)  Michael D. Wagner, Ph.D., provided a brief statement on September 4, 2003 affirming the assessment of Dr. Kadle.  (R. at 185.)

D.    Dr. Tanley

James Tanley, Ph.D., completed a Disability Assessment Report on March 17, 2003 based on a clinical interview and a series of test results.  (R. at 161–64.)  Plaintiff reported having a panic disorder and described her basic activities of daily living.  (R. at 162.)  Dr. Tanley found Plaintiff to be generally cooperative and noted that Plaintiff appeared motivated and did not seem to either exaggerate or minimize her symptoms.  (*Id.*)  He concluded that Plaintiff's functional intelligence was in the mild range of mental retardation.  (R. at 163.)  Dr. Tanley diagnosed a combination of bipolar disorder, panic disorder with agoraphobia, borderline intelligence, and a learning disorder for visuo motor material.  (R. at 163.)  He assigned a GAF of 40.  (*Id.*)  Dr. Tanley concluded that Plaintiff's ability to relate to others was unimpaired during the clinical exam; her ability to understand and follow simple instructions was mildly impaired; her ability to maintain attention and perform simple, repetitive tasks was moderately impaired; and her ability to withstand the stress and pressure of daily work was severely

12

impaired.  (R. at 164.)

Dr. Tanley completed a second Disability Assessment Report on July 29, 2005 based on a clinical interview and various test results.  (R. at 250–54.)  Although Plaintiff's affect was appropriate to thought content, Dr. Tanley noted that a sense of helplessness pervaded her speech.  (R. at 251.)  Dr. Tanley assessed Plaintiff with bipolar disorder, panic disorder with agoraphobia, and borderline intellectual functioning.  (R. at 253.)  He assigned a GAF of 50. (*Id.*)  Dr. Tanley opined that Plaintiff's ability to relate to others was unimpaired during the clinical exam; her ability to understand and follow simple instructions was mildly impaired; her ability to maintain attention and perform simple, repetitive tasks was mildly impaired; and her ability to withstand the stress and pressure of daily work was severely impaired.  (R. at 253.)

Dr. Tanley also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on July 29, 2005.  (R. at 254–56.)  This form consists primarily of checked boxes to represent Dr. Tanley's conclusions.  (*Id.*)  Dr. Tanley indicated his findings were based on his testing and interview with Plaintiff.  (*Id.*)  By checking boxes on this form, Dr. Tanley opined that Plaintiff's ability to make judgments on simple work-related decisions was markedly restricted; her ability to respond appropriately to work pressures in a usual work setting was markedly restricted; and her ability to respond appropriately to changes in a routine work setting was markedly restricted.  (R. at 255.)  Additionally, Dr. Tanley indicated that Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers was moderately restricted. (*Id.*)

## IV. EXPERT TESTIMONY

A.   <u>February 7, 2006 Hearing</u>

Lynn Kaufman testified at the February 2006 administrative hearing as a vocational expert.  (R. at 403–20.)  She classified Plaintiffs past employment as a housekeeper or hotel maid as light, unskilled work, and her past job as an industrial cleaner as medium, unskilled work.  (R. at 405.)

The ALJ asked Ms. Kaufman to consider a person of Plaintiff's age with her past work experience whose understanding and ability to follow instructions was mildly impaired; whose abilities to perform or complete detailed tasks, or understand and remember detailed instructions were moderately impaired; who had no limitations interacting with others including supervisors, co-workers, or the public; and who had marked limitations to handle work involving production quotas or time pressure.  (R. at 406–07.)  The ALJ emphasized that the last marked limitation only involved high end stress and not the type of time pressure that comes with all work.  (R. at 407.)  Ms. Kaufman concluded that such a person could perform Plaintiff's past work.  (*Id.*)  The ALJ also posed a hypothetical person limited to one to two step tasks, which were routine or repetitive in nature, in a stable environment without strict time or production quotas.  (R. at 408.)  Ms. Kaufman again found that such a person could perform Plaintiff's past work.  (*Id.*)  Furthermore, Ms. Kaufman testified that if the ALJ found Plaintiff's testimony to be credible, she would not be able to perform any work.  (R. at 408–09.)

Plaintiff's attorney asked Ms. Kaufman to consider an individual with marked limitations to make judgments on simple work related decisions; marked impairment in her ability to respond appropriately to work pressures in a usual work setting; and marked impairment in her

14

ability to respond appropriately to changes in a routine work setting.  (R. at 409–10.)  According to Ms. Kaufman, an individual with these three marked restrictions would not be able to perform any work.  (R. at 413–14.)  The attorney also posed a hypothetical in which the individual was severely impaired in dealing with the stress and pressure of daily work, without qualification as to type of daily work.  (R. at 415.)  Ms. Kaufman stated that such an individual would have difficulty with the regular demands of daily work, and implied that the individual would not be able to perform competitive work.  (R. at 416.)  Finally, Ms. Kaufman testified that the RFC embedded in the attending psychiatrist's evaluation of Plaintiff was work preclusive.  (R. at 418–19.)

B.    June 19, 2008 Hearing

        Dr. W. Bruce Walsh testified as the vocational expert at the June 2008 hearing.  (R. at 371–77.)  Dr. Walsh stated that, as of the date of the hearing, all of Plaintiff's relevant past work was outside the period of fifteen years.  (R. at 373.)  Considering an RFC limiting an individual to simple, repetitive task with low stress, defined as no production quotas or time pressure tasks, Dr. Walsh found that Plaintiff could perform 40% of medium and light unskilled work and 30% of sedentary unskilled work.  (R. at 373.)  Dr. Walsh further detailed the types of jobs that existed in these categories and the number of applicable jobs.  (R. at 374.)  Moreover, Dr. Walsh implied that if Plaintiff's testimony was credible, she would be unable to participate in competitive work on a sustained basis.  (R. at 375.)  Dr. Walsh also suggested that an individual with the limitations Plaintiff's attending psychiatrist assigned would not be capable of competitive work.  (*Id.*)  Finally, Dr. Walsh provided that if an individual was limited to the extent identified in the "checked boxes" portion of the Dr. Tanley's evaluation, she would be

15

unable to perform the jobs Dr. Walsh identified earlier. (R. at 376.)

## V. ADMINISTRATIVE DECISION

Following the Appeals Council's remand of her initial September 25, 2006 decision, the

ALJ issued a decision on October 31, 2008 finding that Plaintiff was not disabled within the

meaning of the Social Security Act. At the first step of the sequential evaluation process,[4] the

ALJ found that Plaintiff has not engaged in substantially gainful activity since January 28, 2003.

(R. at 14.)

Next, the ALJ found that Plaintiff has the severe combination of impairments best

described as bipolar disorder; panic disorder; and borderline intellectual functioning. (R. at

14–15.) At step three, the ALJ determined that Plaintiff does not have an impairment or

combination of impairments that meet or equal the level of severity described in 20 C.F.R. Part

404, Subpart P, Appendix 1. (R. at 15.) The ALJ specifically found that Plaintiff's mental

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. See 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

16

impairments did not meet or equal the requirements of Listings 12.04, 12.05, or 12.06.  (*Id.*)  The ALJ concluded that Plaintiff had no more than moderate restriction of activities of daily living; no more than moderate difficulties in maintaining social functioning; no more than mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. at 15–16.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  Specifically, the ALJ found:

> After careful consideration of the entire record, it is found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels; however, she is limited to simple repetitive tasks with low stress work involving no productions quotas or time pressured tasks.

(R. at 17.)  In reaching her conclusions regarding Plaintiff's RFC, the ALJ accepted the opinion within Dr. Tanley's narrative report, but found that the boxes he checked within the same Exhibit were not entirely consistent with this opinion.  (R. at 17–18.)  The ALJ explicitly noted that she interpreted Dr. Tanley's finding that Plaintiff was severely impaired to withstand the pressures of daily work as meaning that Plaintiff could not perform fast paced work, work involving production quotas, or work involving time pressured tasks.  (R. at 18.)  After reviewing and summarizing the record evidence, the ALJ found Plaintiff to be not credible to the extent her testimony was inconsistent with the RFC assessment.  (R. at 25–26.)  The ALJ gave the opinions of Dr. Hamill and Ms. Kish little weight.  (R. at 26–27.)

From this RFC assessment, and relying on the testimony of the vocational expert, the ALJ concluded that Plaintiff could  perform a significant number of jobs in the national economy.  (R. at 28.)  Accordingly, she found that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 29.)

17

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d

18

742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff sets forth a variety of issues in her statement of errors.  First, Plaintiff maintains that the ALJ erred in refusing to give controlling or great weight to her treating physician.  Although Plaintiff frames this statement of error in terms of her treating physician, Dr. Hamill, Plaintiff also maintains that the ALJ erred in weighing and interpreting the opinion evidence of Ms. Kish and Dr. Tanley.  (*See* Statement of Errors 25–37, ECF No. 9.)  Plaintiff also contends that the ALJ failed to properly access the Listing Requirements of 12.04(C) and the "Paragraph B" criteria of Listings 12.04, 12.05(D), and 12.06.  Finally, Plaintiff asserts that the ALJ erred in assessing Plaintiff's credibility.

A.      Medical Opinion Evidence and RFC Assessment

1.      Applicable Law

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).  In weighing medical opinions the ALJ must generally consider the nature of the relationship the source has with the claimant (*e.g.*, examining, treating); the supportability of the opinion; the consistency of the opinion with the record as a whole; any relevant specialization; and any other factor that supports or contradicts the opinion evidence.  20 C.F.R. § 416.927(d).

The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 416.927(d)(2).  Even if the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must still meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

Finally, although Plaintiff frames her first contention of error under the treating physician rule, she also challenge the ALJ's interpretation of Dr. Tanley's opinions.  The ALJ articulated this interpretation in both her RFC assessment and her hypothetical questions to the vocational experts.  An RFC assessment is "the most [a claimant] can still do despite limitations."  20 C.F.R. § 416.945.  The ALJ makes this assessment based on all the relevant evidence in the record and will account for a claimant's physical and mental limitations.  *See id.*

Likewise, with regards to hypothetical questions, the United States Court of Appeals for the Sixth Circuit has detailed, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

Consequently, various federal courts, including the Sixth Circuit, have found hypothetical questions inappropriate when such questions did not fully account for a plaintiff's mental limitations. *See, e.g.*, *id.* (hypothetical question limiting a person to simple, repetitive tasks, in a non-public setting, did not account for psychological consultant's conclusion limited the plaintiff to "[two-hour] segments over an eight-hour day where speed was not critical"); *Ball v. Comm'r of Soc. Sec.*, No. 1:09-cv-684, 2011 WL 765978, at *4 (S.D. Ohio Feb. 25, 2011) (finding that an ALJ's hypothetical limiting a plaintiff to low stress jobs; simple, routine, repetitive tasks; and no fast-paced production requirements, "incorporated some but not all of the moderate limitations the ALJ found to exist."); *Renn v. Comm'r of Soc. Sec.*, No. 1:09-CV-319, 2010 WL 3365944, at *6 (S.D. Ohio Aug. 24, 2010) (holding that an RFC limiting Plaintiff to simple, routine repetitive tasks; occasional interaction with public; and only routine changes in work setting, did not properly account for the plaintiff's moderate deficits in memory, attention, and concentration); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) (hypothetical question limiting a plaintiff to simple, routine, repetitive, low stress work, "made short shrift of [the plaintiff's] social and temperamental impairments"); *Tune v. Astrue*, 760 F. Supp. 2d 555, 563 (E.D.N.C. 2011) ("Numerous courts have admonished [ALJs] for presenting simplified mental RFC findings to the VE that did not encompass all of the findings made in the decision.").

    2.   <u>Analysis</u>

In this case, the bulk of the evidence indicates that Plaintiff is severely impaired in her ability to handle the stress of daily work. Plaintiff suffers from panic and anxiety disorders, with a history of severe panic attacks and auditory hallucinations. Every physician and counselor who has treated or examined Plaintiff within the relevant period has found her to be (at least)

severely limited in her ability to handle the stress of daily work.  Following both of his

evaluations of Plaintiff, Dr. Tanley concluded that Plaintiff was severely impaired in her ability

to withstand the stress and pressure of daily work.  (R. at 164; 253.)  On the same day as his July

2005 examination of Plaintiff, Dr. Tanley also checked a box providing that Plaintiff was

markedly limited in her ability to respond to work pressures within a usual work setting.  (R. at

255.)  Additionally, Dr. Hamill, Plaintiff's treating physician, concluded that she has "no useful

ability to function" in order to "deal with normal work stress."[5]  (R. at 200.)  As recently as July

2008, Dr. Hamill explicitly opined that Plaintiff would not be able to "handle the stress of any

type of job."  (R. at 335.)  Ms. Kish, Plaintiff's counselor, also determined that she has "no

useful ability to function" to allow her to "deal with normal work stress."[6]  (R. at 227.)

Moreover, over the course of their treatments and evaluations of Plaintiff, Dr. Hamill, Dr.

---

[5]  The ALJ gave little weight to Dr. Hamill's opinions, concluding, in part, that Dr.
Hamill was too reliant on Plaintiff's subjective complaints.  (R. at 26–27.)  Even assuming that
Dr. Hamill's opinions were not entitled to controlling weight under the treating physician rule,
the ALJ was still required to weigh his opinions in conjunction with the factors outlined in the
Regulations.  *See* 20 C.F.R. § 416.927(d).  Given the extensive nature of Dr. Hamill's treating
relationship with Plaintiff, and the fact that his stress-related opinions appear at least partially
consistent with the opinions of Dr. Tanley, as well as Ms. Kish, it appears that some of Dr.
Hamill's opinions may have been entitled to more than little weight.  As described further below,
remand is necessary in this case.  On remand, the Commissioner should re-evaluate the opinions
of Dr. Hamill, applying the treating physician rule.  Furthermore, such opinions should not be
rejected simply because of the less tangible nature of mental impairments and the diagnostic
techniques applied in the field.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)
("The report of a psychiatrist should not be rejected simply because of the relative imprecision of
the psychiatric methodology or the absence of substantial documentation, unless there are other
reasons to question the diagnostic techniques.").

[6]  The undersigned acknowledges that under the Regulations, Ms. Kish, is an "other
source" as opposed to an "acceptable medical source."  *See* 20 C.F.R. § 416.913.  Nevertheless, a
relevant Social Security Ruling has acknowledged the growing role that such sources are playing
in providing medical care, and emphasizes that opinions from such sources should not be taken
lightly.  *See* SSR 06-03p, 2006 WL 2329939, at *2–3 (Aug. 9, 2006).

Tanley, and Ms. Kish assigned Plaintiff various GAF scores ranging from 35 to 50. (See, e.g., R. at 198, 253.) Even the highest of these scores demonstrates serious symptoms or other impairments. *See Hash*, 309 F. App'x at 988 n.1.

In weighing the medical evidence, the ALJ adopted Dr. Tanley's narrative opinion. (R. at 17.) The ALJ explicitly recognized that this written report described Plaintiff as severely impaired in her ability to withstand the stress and pressure of daily work. (*Id.*) In forming her RFC and hypothetical questions to the vocational experts, however, the ALJ interpreted Dr. Tanley's opinion to mean that Plaintiff needed a job without fast paced work, production quotas, or time pressured tasks. (R. at 18, 373, 407.) Ultimately, the ALJ assigned an RFC finding Plaintiff capable of performing simple repetitive tasks with low stress work involving no production quotas or time pressured tasks. (R. at 17.)

Here, the ALJ's hypothetical questions and subsequent RFC fail to adequately accommodate Plaintiff's mental limitations. As detailed above, the evidence establishes that Plaintiff is, at least, severely impaired in her ability to handle work stress.[7] Nothing within the opinions of Dr. Hamill, Dr. Tanley, or Ms. Kish suggest that Plaintiff's impairment would only influence her ability to perform fast paced work. Rather, the opinions suggest that Plaintiff is markedly impaired in her ability to handle the stress of usual work. (*See, e.g.*, R. at 255, 335.) Similar to the circumstances of the authority above, it appears the ALJ did not adequately account for Plaintiff's mental impairments in presenting her hypothetical questions to the vocational experts. Accordingly, at least based on the current record, the ALJ's assessment that

---

[7] The ALJ also implicitly accepted this limitation by adopting Dr. Tanley's narrative report. (R. at 17, 253.)

Plaintiff can perform simple repetitive tasks with no production quotas or time pressures, does not sufficiently account for this mental limitation.[8]

Furthermore, the ALJ's interpretation of Dr. Tanley's opinions is unpersuasive. Once again, the ALJ interpreted Dr. Tanley's stress-related opinions to mean that Plaintiff was precluded from fast paced work, production quotas, or time pressured tasks. (*See* R. at 18, 373, 407.) To justify this interpretation, the ALJ stated that she resolved inconsistencies between Dr. Tanley's written report and his "checked boxes" report in favor of the written report. (R. at 18.) It is true that portions of the written report appear to be in some tension with the boxes Dr. Tanley checked regarding Plaintiff's abilities. (*Compare* R. at 253; *with* R. at 254–55.) With regards to Plaintiff's ability to handle work stress, however, there is no inconsistency between the two reports. Rather, Dr. Tanley's checked-box form serves to clarify his narrative report, as it is slightly more specific in detailing that Plaintiff's limitation applies to usual work settings. (*See* R. at 253, 255.) Neither the checked box or written opinion gives any indication that Plaintiff's stress limitations are confined to work involving production quotas or intensive time pressures. (*See id.*) Consequently, even disregarding the checked-box form, Dr. Tanley's written report suggests that Plaintiff was severely impaired in handling the stress of daily work, without qualification as to the type of work involved.

Finally, the opinions of the reviewing physicians are not sufficient evidence to justify the ALJ's hypothetical questions and RFC in this case. (*See* R. at 186–97.) The ALJ's RFC appears to be consistent with Dr. Kadle's May 2003 opinion that Plaintiff was capable of routine

---

[8] The ALJ's RFC does use the term "low stress" to categorize the work Plaintiff can perform, but her hypothetical questions make clear that this meant work not involving production quotas or other high stress time pressures. (*See* R. at 17, 373, 407.)

24

tasks in a stable environment with no production quotas.[9]  (R. at 189.)  In forming a hypothetical

question, an ALJ may, in some circumstances, rely on medical opinion evidence "translat[ing] an

opinion regarding the claimant's mental limitations into an RFC assessment."  *Milliken v.*

*Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010); *see also Smith v. Halter*, 307 F.3d 377, 379 (6th

Cir. 2001) (approving of an ALJ's reliance on an examining psychiatrist's RFC

recommendations in forming his hypothetical question).  Under the circumstances of this case,

however, the reviewing physicians' opinions are insufficient to justify the hypothetical question

and RFC the ALJ applied.  Drs. Kadle's opinions was issued in 2003, before the treating and

examining physicians submitted the majority of their opinion evidence.  Furthermore, Kadle's

opinion contains no indication that she considered Plaintiff markedly limited in her ability to

handle work stress.[10]  (*See* R. at 186–97.)  Accordingly, it is simply unclear from the record that

Dr. Kadle's opinion accounted for Plaintiff's limitation in handling work stress.

In summary, the ALJ assumed, without adequate support from the record, that Dr.

Tanley's opinions regarding Plaintiff's ability to adapt to work stress meant that Plaintiff could

not complete fast paced work.  Contrary to this interpretation, the current record suggests that

Plaintiff's impairments would influence her ability to handle the stress of any typical work.

---

[9]  Dr. Wagner concurred with this opinion in September 2003.  (R. at 185.)

[10]  Dr. Kadle did not issue a direct opinion on Plaintiff's ability to handle the stress of
daily work.  (*See* R. at 186–97.)  Some of her opinions do imply that she found Plaintiff less
restricted in this regard than the other sources.  (*See* R. at 187–88.)  To the extent there is an
inconsistency, the undersigned finds that the reviewing physician opinions are not substantial
evidence to counter Plaintiff's severe limitation in handling work stress.  Dr. Hamill, Dr. Tanley,
and Ms. Kish all had an opportunity to examine or treat Plaintiff, and all concluded that Plaintiff
had at least a severe impairment in this regard.  Without more, the brief conclusions of the two
reviewing physicians are not enough to overcome this evidence.

Because the hypothetical questions and RFC did not fully account for this limitation, substantial evidence does not support the vocational expert testimony upon which the ALJ relied.  *See Ealy*, 594 F.3d at 516.

B.    Remand

If substantial evidence does not support the Commissioner's decision, the Court must decide the nature of remand.  The Court has the discretion to enter "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In discussing the standard for deciding the nature of remand, the United States Court of Appeals for the Sixth Circuit, has noted:

> The Court can reverse a decision of the Commissioner and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990). A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking. *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). On the other hand, 42 U.S.C. § 405(g) gives the court the power to remand for a rehearing, and the court is obliged to do so if all essential factual issues have not yet been resolved. *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

*Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007).

The vocational experts testified that if Dr. Tanley's opinions were accepted, Plaintiff would have difficulty or would be precluded from working.[11]  At this juncture, however, the

---

[11]  The vocational expert at the first hearing indicated that if Plaintiff was severely impaired in her ability to handle the stress of daily work she would have difficulty performing work.  (R. at 416.)  The vocational expert at the second hearing suggested that if all of Dr. Tanley's "checked box" opinions were adopted the restrictions would preclude work.  (*See* R. at 376.)

undersigned is unwilling to conclude that all essential factual issues have been resolved and that proof of disability is overwhelming. Accordingly, with respect to the Commissioner's general fact-finding role, the Court will remand this case instead of rewarding benefits. Consequently, on remand, whether through additional expert testimony, re-contacting opinion sources, or otherwise, the Commissioner should re-evaluate Plaintiff's claim and develop the record to fully accommodate for her mental limitations.[12]

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** this case for further consideration consistent with this Report and Recommendation.

In her Statement of Errors Plaintiff includes a brief request for attorney's fees pursuant to the Equal Access to Justice Act. Neither party has briefed the issue. The undersigned finds that additional briefing will assist the Court in resolution of this issue. Consequently, at this time, the undersigned **RECOMMENDS** that this request be **DENIED** without prejudice so that Plaintiff may apply separately for attorney's fees pursuant to the Equal Access to Justice Act if she desires to do so.

## IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

---

[12] As noted above, the undersigned finds remand necessary based on Plaintiff's first contention of error. In light of this conclusion, and considering the policies of judicial economy and restraint, the undersigned will refrain from reaching the remainder of the issues Plaintiff raises in her Statement of Errors. The undersigned encourages the Commissioner to revisit these issues on remand.

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: August 2, 2011                                 */s/ Elizabeth A. Preston Deavers*
                                                              Elizabeth A. Preston Deavers
                                                              United States Magistrate Judge